151 N.J. Super. 200 (1977)
376 A.2d 950
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
JOSEPH S. PORTASH, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 1977.
Decided June 29, 1977.
*201 Before Judges BISCHOFF, MORGAN and KING.
Mr. Michael E. Wilbert argued the cause for appellant (Messrs. Wilbert, Clyne & Montenegro, attorneys).
*202 Mr. Benjamin D. Leibowitz, Deputy Attorney General, argued the cause for respondent (Mr. William F. Hyland, Attorney General of New Jersey, attorney).
The opinion of the court was delivered by MORGAN, J.A.D.
In this appeal from his conviction of statutory extortion (N.J.S.A. 2A:105-1) defendant challenges a trial court ruling permitting state use of defendant's grand jury testimony, compelled under a grant of immunity, as a means of impeaching the credibility of his trial testimony. In reliance upon this ruling defendant declined to testify in his own behalf. We reverse.
According to the State's theory of the case, which the jury apparently accepted, defendant Joseph S. Portash, while a member of the Ocean County Board of Freeholders, a member of the Manchester Township Committee and a member of the Manchester Municipal Utilities Authority, accepted approximately $31,730 from one Donald Safran, trading as the Madison Agency, Inc. (Agency), a real estate and insurance company in Ocean County. Although this money was supposed to have been given in payment for services rendered by defendant, the evidence adduced suggested that no such services were performed and that, in fact, the Agency was covertly acting as a mere conduit for transmission of the money from another company, Leisure Technology Corporation (Leisure), a major real estate developer in Ocean County, which received favorable treatment by the public bodies on which defendant served.
Because disposition of this appeal turns on the permitted use of defendant's compelled and immunized grand jury testimony, it is unnecessary for us to recount in detail the considerable testimony adduced during the 16-day jury trial which, in our view, and contrary to defendant's contentions, adequately supports the jury's verdict of defendant's guilt. The facts surrounding the immunity granted defendant are, however, brief and undisputed.
*203 On November 6, 1974 defendant appeared, with counsel, before a state grand jury investigating Robert Schmertz, Leisure's president, and Safran, Agency's principal, in response to a subpoena served upon him on October 29, 1974, and expressed his intention of claiming the Fifth Amendment privilege against self-incrimination. Subpoenaed again for November 14, 1974, defendant was granted immunity in the following terms:
We have agreed that the testimony that Mr. Portash is about to give before the Grand Jury, under oath, that any adverse evidence derived therefrom shall not be used in any subsequent criminal prosecution against him, except for a prosecution for contempt, false swearing or perjury. No representations have been made insofar as prosecution for any offenses for which evidence has already been presented to a State Grand Jury, a separate Grand Jury from the one Mr. Portash is about to appear before.
Defendant was asked whether he understood the purport of this agreement.
MR. LUCIANI: Mr. Portash, do you understand  have you discussed this matter with your attorney?
MR. PORTASH: I believe so.
MR. LUCIANI: And you understand the fact that nothing you are about to testify to can be used against you, personally, in any subsequent criminal prosecution?
MR. PORTASH: To the best of my knowledge of legal matters, yes.
Following statement of this agreement, defendant testified. Thereafter continued negotiations between defendant's counsel and the State ensued with the objective of terminating defendant's exposure to prosecution in return for his restitution of the monies received and resignation from office. No agreement was reached in this regard and defendant was thereafter indicted on information derived from sources unconnected with his grand jury testimony. Defendant does not challenge the indictment underlying this case as being derived *204 even indirectly from his compelled grand jury testimony.
After completion of the State's case, defendant sought a ruling from the trial judge as to whether the State would be permitted to use his grand jury testimony in cross-examination in the event he chose to testify in his own behalf. Following extended argument the judge ruled that if defendant testified and were asked a question on either direct or cross-examination which elicited a response materially inconsistent with his prior testimony before the grand jury and relevant to the issues at trial, then the State would be permitted to refer to that portion of the grand jury testimony in its cross-examination. It was in reliance upon this ruling that defendant declined to testify on his own behalf.
The statutory authority for the State's grant of immunity to defendant, N.J.S.A. 2A:81-17.2a2, reads as follows:
If any public employee, having claimed the privilege against self-incrimination, testifies before any court, grand jury or the State Commission of Investigation after having been informed that his failure to appear and testify would subject him to removal from his office, position or employment, such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State; provided that no such public employee shall be exempt from prosecution or punishment for perjury or false swearing committed while so testifying.
Clearly, the grant of immunity appearing on the record of the grand jury proceedings at which defendant testified was in strict accordance with this statutory authority and resulted in precluding use of the compelled testimony or evidence derived therefrom in any subsequent criminal proceeding against defendant.
The State contends that a grant of use immunity pursuant to N.J.S.A. 2A:81-17.2a2 only precludes use of the compelled testimony as part of the State's affirmative case against the witness; not precluded is its use for impeaching the credibility of the witness, later a defendant, who testifies at *205 variance therewith. To hold otherwise would, in the State's view, confer a license to commit perjury. We disagree with the State's definition of the scope of protection afforded by use immunity and the consequences feared from rejection of its position.
A valid claim of the Fifth Amendment privilege against self-incrimination made before a grand jury will, of course, be honored, and the witness claiming it cannot be required to testify. Because of the imperatives of investigation, however, the device of immunizing such testimony from later use against the witness in a subsequent criminal proceeding was fashioned as a means of compelling such otherwise privileged testimony without compromising the integrity of the constitutional protection afforded by the Fifth Amendment and cognate state constitutional guarantees. The immunity device, however, will only be deemed a sufficient answer to a claim of privilege if the scope of immunity afforded is commensurate in all respects with the privilege against self-incrimination which it replaces. United States v. Calandra, 414 U.S. 338, 346, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974); Kastigar v. United States, 406 U.S. 441, 459, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972). In order for a grant of immunity to pass constitutional muster as an adequate substitute for the self-incrimination privilege, it must leave the witness whose testimony has been compelled and the prosecutorial authorities "in substantially the same position as if the witness had claimed the Fifth Amendment privilege." Kastigar v. United States, supra at 462, 92 S.Ct. at 1666.
The essential inquiry here, therefore, is whether the proposed use of the immunized grand jury testimony to impeach defendant's trial testimony would leave defendant and the State in the position each would have occupied had defendant's claim of privilege been honored. That inquiry can only be answered in the negative. Had defendant been permitted to refuse testimony before the grand jury on his claim of privilege, the present argument by the State could not *206 even have been made; no testimony to be used for impeachment purposes would have existed. Had defendant's testimony not been compelled, he would have been able to testify at his trial free from the fear engendered by the possible use of prior inconsistent testimony for purposes of impeachment. It necessarily follows that if the grant of immunity is to be viewed as commensurate with the lost privilege against self-incrimination, then he should be accorded the same freedom to testify in his own behalf at trial as he would have enjoyed had he been permitted to remain silent before the grand jury.
A similar issue was considered and disposed of in United States v. Hockenberry, 474 F.2d 247 (3 Cir.1973). In Hockenberry, the prosecution used immunized grand jury testimony given by Hockenberry to impeach his credibility at his trial on a charge of some other wrongdoing. The conviction was reversed on the ground that the immunized testimony could not be so used without jeopardizing the adequacy of the immunity as a constitutional means of compelling self-incriminatory testimony. The court in Hockenberry observed in terms pertinent to the present matter:
But for the grant of immunity Hockenberry would have been privileged to refuse to admit to the grand jury his wrongdoing in the execution of affidavits to obtain search warrants. And if immunity that deprived him of that privilege is to be, as constitutionally it must, co-extensive with the privilege itself, his compelled admission of wrongdoing cannot later be used to discredit his effort to defend himself against a charge of some other wrongdoing. [at 250]
In this case, unlike Hockenberry, the immunized testimony was sought to be used to discredit defendant's effort to defend himself with respect to the very matters about which his testimony was compelled. The argument for excluding such testimony is, therefore, even more compelling in this case than it was in Hockenberry.
The State's reliance upon Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and its progeny as an analogy to the issue under consideration is inappropriate. *207 Harris held that defendant's voluntary incriminating statement, although inadmissible as part of the State's case in chief because obtained without Miranda warnings having been given, can be used to test defendant's credibility if he chooses to testify in his own behalf at the trial. The difference between the Harris-type case and the present case is obvious. In Harris-type situations the statement sought to be used for impeachment has been voluntarily given; in the present case the testimony was judicially compelled under a promise of immunity the State now wishes to modify after the testimony has been given. In Harris the statement was not made in reliance upon warnings never given; here, the testimony was compelled upon the State's promise that the testimony judicially coerced would not be used "in any respect." Kastigar v. United States, supra, 406 U.S. at 453, 92 S.Ct. at 1653. The question is whether the State should be required to honor its promise, expressed in its statute and explicated in leading cases defining the required scope of immunity, not to use the testimony compelled in any subsequent criminal proceeding against the defendant, except in circumstances not here pertinent.[1] In our view, the quid pro quo for depriving defendant of his self-incrimination privilege should be exacted and the trial judge erroneously ruled otherwise.
We agree with the State that forbidding use of immunized testimony for impeachment purposes impedes disclosure of truth. No one, however, has ever claimed for the privilege against self-incrimination the effect of revealing truth; its substitute, use immunity, has of course the same effect. Clearly, invocation of a valid claim of privilege results in a partial suppression of facts relevant to a given issue and to that extent results in obscuring the truth of the matter. It is, however, in the "fundamental values and most noble aspirations" which underlie that zealously safeguarded *208 Fifth Amendment privilege (and the immunity which stands in its place) that the courts have discerned the fully justifiable basis for partially sacrificing the truth-seeking quest which is the essential business of a criminal trial. See Murphy v. Waterfront Comm'n, 378 U.S. 52, 55, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964). Indeed, all privileges suppress truth in the service of other equally regarded values.
The State further contends that precluding use of immunized testimony for impeachment purposes "would leave the State without any remedy against defendant's trial perjury." Without commenting upon the overstatement inherent in this contention, we can concede that this statement is substantially so. It would have been equally so, however, had the State declined to compel defendant to give testimony under a promise of immunity. Had defendant been permitted his silence before the grand jury, the testimony which the State sought to use for impeachment purposes would not even exist and the State would have been just as disabled from testing defendant's credibility as it is when it is precluded from using the testimony it chose to compel. Clearly, in the very statement of its position, the State is seeking benefit from the immunized testimony it would not have enjoyed had defendant been permitted to remain silent as he was privileged to do. Indeed, immunized testimony cannot be used as evidence of perjury or false swearing in giving nonimmunized testimony. State v. Williams, 59 N.J. 493, 500 (1971). Hence, a breach of immunity will not be countenanced even as a prophylactic measure designed to prevent perjury or to insure the giving of truthful testimony, the specific purpose for which the State intended to use the testimony in the present case.
Although we agree with the State's assertion that a deliberately false statement debases the judicial process, so does the State's failure or refusal to honor its voluntary commitments. The State was free to act as it chose; it was under no compulsion to grant immunity. Defendant, however, *209 enjoyed no such freedom. Once the State granted immunity, his privilege against self-incrimination was gone, only because the immunity granted was supposed to have been commensurate in its protection with the lost privilege. To accept the State's position, in our view, would constitutionally impair the privilege and render suspect the immunity which must by constitutional command afford precisely the same degree of protection.
Defendant sought the trial court ruling under consideration as a basis upon which to decide whether to testify in his own behalf. In reliance thereon, and fearful of the use to which the grand jury testimony would be put, he decided against testifying. The jury, therefore, decided the case on the basis of partial evidence. We have no doubt the erroneous ruling of the trial judge requires reversal of the conviction and a new trial for defendant.
Because of our ruling, it is unnecessary for us to consider the many other claims of error asserted by defendant.
The conviction is reversed and the matter remanded to the trial court for a new trial.
NOTES
[1] I.e. in a charge for perjury or false swearing in giving the compelled testimony.