# NEW JERSEY *v.* PORTASH

No. 77–1489.   Argued December 5, 1978—Decided March 20, 1979

Stewart, J., delivered the opinion of the Court, in which Brennan, White, Marshall, Powell, Rehnquist, and Stevens, JJ., joined. Brennan, J., filed a concurring opinion, in which Marshall, J., joined, *post,* p. 460. Powell, J., filed a concurring opinion, in which Rehnquist, J., joined, *post,* p. 462. Blackmun, J., filed a dissenting opinion, in which Burger, C. J., joined, *post,* p. 463.

*Edwin H. Stier* argued the cause for petitioner. With him on the brief were *John J. Degnan,* Attorney General of New Jersey, and *Richard W. Berg,* Deputy Attorney General.

*Michael E. Wilbert* argued the cause and filed a brief for respondent.

Mr. Justice Stewart delivered the opinion of the Court.

This case involves the scope of the privilege against compulsory self-incrimination, grounded in the Fifth Amendment and made binding against the States by the Fourteenth. The precise question is whether, despite this constitutional privilege, a prosecutor may use a person's legislatively immunized grand jury testimony to impeach his credibility as a testifying defendant in a criminal trial.

I

In the early 1970's, Joseph Portash was Mayor of Manchester Township, Executive Director of the Pinelands Environmental Council, and a member of both the Ocean County Board of Freeholders and the Manchester Municipal Utilities Authority in New Jersey. In November 1974, after a lengthy investigation, a state grand jury subpoenaed Portash. He expressed an intention to claim his privilege against compulsory self-incrimination. The prosecutors and Portash's lawyers then agreed that, if Portash testified before the grand jury, neither his statements nor any evidence derived from them could, under New Jersey law, be used in subsequent criminal proceedings (except in prosecutions for perjury or

false swearing).[1]    After Portash's testimony, the parties tried to come to an agreement to avoid a criminal prosecution against Portash, but no bargain was reached.    In April 1975, Portash was indicted for misconduct in office and extortion by a public official.[2]

Before trial, defense counsel sought to obtain a ruling from the trial judge that no use of the immunized grand jury testimony would be permitted.    The judge refused to rule that the prosecution could not use this testimony for purposes of impeachment.    After the completion of the State's case, defense counsel renewed his request for a ruling by the trial judge as to the use of the grand jury testimony.    There followed an extended colloquy, and the judge finally ruled that if Portash testified and gave an answer on direct or cross-examination which was materially inconsistent with his grand jury testimony, the prosecutor could use that testimony in his cross-examination of Portash.    Defense counsel then stated that, because of this ruling, he would advise his client not to take the stand.    Portash did not testify, and the jury ultimately found him guilty on one of the two counts.

---

[1] At that time a New Jersey statute provided as follows:

"If any public employee testifies before any court, grand jury or the State Commission of Investigation, such testimony and the evidence derived therefrom shall not be used against such public employee in a subsequent criminal proceeding under the laws of this State; provided that no such public employee shall be exempt from prosecution or punishment for perjury committed while so testifying." New Jersey Public Employees Immunity Statute, N. J. Stat. Ann. § 2A:81–17.2a2 (West 1976).

[2] Portash has not contended that the indictment was based on information disclosed by or "derived" from his immunized testimony.    Before trial he did move for dismissal of the indictment on two grounds.    First, he argued that the course of dealings between himself and the prosecution established an agreement that he would not be prosecuted so long as he cooperated with the State.    Second, he contended that he had impermissibly been forced to incriminate himself by providing certain employment records to the grand jury.    The trial court rejected both arguments; neither is urged here.

The New Jersey Appellate Division reversed the conviction. 151 N. J. Super. 200, 376 A. 2d 950 (1977). That court held that the Constitution requires that the immunity granted by the New Jersey statute must be at least coextensive with the privilege afforded by the Fifth and Fourteenth Amendments. To confer such protection, the court reasoned, the grant of immunity must "leave defendant and the State in the position each would have occupied had defendant's claim of privilege [before the grand jury] been honored." *Id.*, at 205, 376 A. 2d, at 953. Use of the immunized grand jury testimony to impeach a defendant at his trial, it held, did not meet this test. Because Portash's decision not to testify was based upon the trial court's erroneous ruling to the contrary, the Appellate Division reversed the conviction and remanded the case for a new trial.[3] The New Jersey Supreme Court denied the State's petition for certification of an appeal. 75 N. J. 597, 384 A. 2d 827 (1978). We granted certiorari. 436 U. S. 955.

## II

New Jersey presents two questions. First, it argues that Portash cannot properly invoke the privilege against compulsory incrimination because he did not take the witness stand and, as a result, his immunized grand jury testimony was never used against him. Second, it urges that the Fifth and

---

[3] We read the state-court opinion as resting its judgment unambiguously and exclusively on the Federal Constitution. The court said:

"The immunity device, however, will only be deemed a sufficient answer to a claim of privilege if the scope of immunity afforded is commensurate in all respects with the privilege against self-incrimination which it replaces. *United States* v. *Calandra*, 414 U. S. 338, 346 . . . (1974); *Kastigar* v. *United States*, 406 U. S. 441, 459 . . . (1972)." 151 N. J. Super., at 205, 376 A. 2d, at 953.

Both *Calandra* and *Kastigar* were, of course, federal constitutional decisions. The court discussed several other federal cases in the course of its opinion, and nowhere indicated any reliance on principles of state constitutional or common law.

Fourteenth Amendments do not prohibit the use of immunized grand jury testimony to impeach materially inconsistent statements made at trial.

### A

The State contends that the issue presented by Portash is abstract and hypothetical because he did not, in fact, become a witness. Portash could have taken the stand, testified, objected to the prosecution's use of the immunized testimony to impeach him, and appealed any subsequent conviction. Absent that, the State would have us hold that the constitutional question was not and is not presented. This argument must be rejected. First, it is clear that although the trial judge was concerned about making a ruling before specific questions were asked, he did rule on the merits of the constitutional question:

> "THE COURT: Well, this is what the Court was concerned with and still is and I thought the Court had straightened it out previously, the witness taking the stand and testifying as to something and then have counsel saying didn't you say before the grand jury such and such.
>
> "MR. WILBERT [defense counsel]: That's the problem that we have. We don't know whether he's going to be able to use that or not, your Honor, especially if he didn't touch that area in his examination—
>
> "THE COURT: Mr. Wilbert, suppose your client takes the stand and he testifies that I worked for Donald Safran and suppose he testified before the grand jury I never worked for Donald Safran?
>
> "MR. WILBERT: Inconsistency and under your Honor's ruling that can be used in this case.
>
> "THE COURT: *No doubt about it.*
>
> "MR. WILBERT: Your Honor, I would submit it could be used over my objection, of course.

"THE COURT: You have a standing objection with respect to the use at all of the grand jury testimony." (Emphasis added.) App. 223a.

Second, the New Jersey appellate court necessarily concluded that the federal constitutional question had been properly presented, because it ruled in Portash's favor on the merits.[4] See *Raley* v. *Ohio*, 360 U. S. 423, 435–437; cf. *Jenkins* v. *Georgia*, 418 U. S. 153, 157; *Coleman* v. *Alabama*, 377 U. S. 129, 133; *Whitney* v. *California*, 274 U. S. 357, 360–361; *Manhattan Life Ins. Co.* v. *Cohen*, 234 U. S. 123, 134.

Moreover, there is nothing in federal law to prohibit New Jersey from following such a procedure, or, so long as the "case or controversy" requirement of Art. III is met, to foreclose our consideration of the substantive constitutional issue now that the New Jersey courts have decided it. This is made clear by a case decided by this Court in 1972, *Brooks* v. *Tennessee*, 406 U. S. 605. There the Court held unconstitutional a Tennessee statutory requirement that a defendant in a criminal case had to be his own first witness if he was to take the stand at all. The Court held that such a requirement unconstitutionally penalized a defendant's right to remain silent, since a defendant could remain silent immediately after the close of the State's case only at the cost of never testifying in his own defense. Although Brooks had not testified, the Tennessee court considered the constitutional validity of the state statute, and so did this Court. Because the rule imposed

---

[4] *Lefkowitz* v. *Newsome*, 420 U. S. 283, was another case where provisions of state law allowed federal review that may not otherwise have been available. There, New York law allowed a defendant to appeal defeat of a motion to suppress even though he later pleaded guilty. The Court held that because the State recognized such a procedure, a state prisoner who had pleaded guilty could assert his Fourth and Fourteenth Amendment claim in a federal habeas corpus proceeding, even though federal habeas corpus relief would not generally have been available to one who had pleaded guilty.

a penalty on the right to remain silent, the Court found that his constitutional rights had been infringed even though he had never taken the stand. *Id.*, at 611 n. 6.

In *Brooks* the Court held that the defendant's Fifth and Fourteenth Amendment rights had been violated because, in order to assert his Fifth Amendment right to remain silent after the prosecution's case in chief had been presented, the defendant would have had to pay a penalty. He could never testify. Here, as in *Brooks,* federal law does not insist that New Jersey was wrong in not requiring Portash to take the witness stand in order to raise his constitutional claim.[5]

## B

In both Great Britain and in what later became the United States, immunity statutes, like the privilege against compulsory self-incrimination, predate the adoption of the Constitution. *Kastigar* v. *United States,* 406 U. S. 441, 445 n. 13, 446 n. 14. This Court first considered a constitutional challenge to an immunity statute in *Counselman* v. *Hitchcock,* 142 U. S. 547. The witness in that case had refused to testify before a federal grand jury in spite of a grant of immunity under the relevant federal statute. The Court overturned his contempt conviction. It construed the statute to permit the use of evidence *derived* from his immunized testimony. The witness was held to have validly asserted his privilege because "legislation cannot abridge a constitutional privilege, and . . . it cannot replace or supply one, at least unless it is so broad

---

[5] A similar situation existed in *Wardius* v. *Oregon,* 412 U. S. 470. The Court held in that case that state notice-of-alibi requirements could be enforced only if the State provided reciprocal discovery rights for the defendant. The defendant in that case had not given a notice of alibi. The State argued that he could not assert his constitutional claim, because he should have given his notice of alibi and then argued that the State had to grant him reciprocal discovery. The Court rejected that argument, and held that he need not give notice to raise his constitutional claim.

as to have the same extent in scope and effect." *Id.*, at 585.
See also *Brown* v. *United States,* 359 U. S. 41; *Ullmann* v.
*United States,* 350 U. S. 422; *Brown* v. *Walker,* 161 U. S. 591.
After the holding in *Malloy* v. *Hogan,* 378 U. S. 1, that the
Fifth Amendment privilege against compulsory self-incrimi-
nation is also contained in the Fourteenth Amendment, this
rule is necessarily applicable to state immunity statutes as
well. Cf. *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52.[6]

Language in *Counselman* and its progeny was read by some
to require that the witness must be immune from prosecution
for the transaction his testimony concerned. Indeed, the fed-
eral statutes subsequently upheld by the Court granted such
transactional immunity. *Brown* v. *United States, supra; Ull-
man* v. *United States, supra; Heike* v. *United States,* 227 U. S.
131; *Brown* v. *Walker, supra.*[7] The adoption of Pub. L. 91–
452 in 1970 marked a change in federal immunity legislation
from the provision of transactional immunity to the provision
of what is known as "use" immunity. 18 U. S. C §§ 6001,
6002. This immunity, similar to that provided by the New
Jersey statute in this case, protects the witness from the use
of his compelled testimony and any information derived from
it. In *Kastigar* v. *United States, supra,* the Court upheld
that statute against a challenge that mere use immunity is
not coextensive with the Fifth Amendment's privilege.

"The privilege has never been construed to mean that one
who invokes it cannot subsequently be prosecuted. Its

---

[6] The *Murphy* case dealt with the problem of dual sovereignty. The
issue was whether a State could grant constitutionally sufficient immunity
if another jurisdiction could use the immunized testimony in a prosecu-
tion. The Court proceeded on the premise that a State is required to
provide at least use immunity, and held that such immunity would have
to be honored by the Federal Government. See *Kastigar* v. *United States,*
406 U. S. 441, 455–459.

[7] See *Shapiro* v. *United States,* 335 U. S. 1, 6 n. 4, for a list of the
federal statutes that provided transactional immunity.

sole concern is to afford protection against being 'forced to give testimony leading to the infliction of "penalties affixed to . . . criminal acts." ' Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U. S., at 453. (Emphasis in original; footnote omitted.)

Against this broad statement of the necessary constitutional scope of testimonial immunity, the State asks us to weigh *Harris* v. *New York*, 401 U. S. 222, and *Oregon* v. *Hass*, 420 U. S. 714.[8] Those cases involved the use of statements, concededly taken in violation of *Miranda* v. *Arizona*, 384 U. S. 436, to impeach a defendant's testimony at trial. In both cases the Court weighed the incremental deterrence of police illegality against the strong policy against countenancing perjury. In the balance, use of the incriminating statements for impeachment purposes prevailed. The State asks that we apply the same reasoning to this case. It points out that the interest in preventing perjury is just as strongly involved, and that the statements made to the grand jury are at least as reliable as those made by the defendants in *Harris* and *Hass*.

But the State has overlooked a crucial distinction between those cases and this one. In *Harris* and *Hass* the Court expressly noted that the defendant made "no claim that the statements made to the police were coerced or involuntary," *Harris* v. *New York, supra,* at 224; *Oregon* v. *Hass, supra,* at

---

[8] The Court in both the *Harris* and *Hass* cases relied on *Walder* v. *United States,* 347 U. S. 62, a case in which the Court held that the Fourth Amendment's exclusionary rule does not prevent the use of unconstitutionally seized evidence to impeach a defendant's credibility.

722–723. That recognition was central to the decisions in those cases.

The Fifth and the Fourteenth Amendments provide that no person "shall be *compelled* in any criminal case to be a witness against himself." As we reaffirmed last Term, a defendant's compelled statements, as opposed to statements taken in violation of *Miranda*, may not be put to any testimonial use whatever against him in a criminal trial. "But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law." (Emphasis in original.) *Mincey* v. *Arizona*, 437 U. S. 385, 398.[9]

Testimony given in response to a grant of legislative immunity is the essence of coerced testimony. In such cases there is no question whether physical or psychological pressures overrode the defendant's will; the witness is told to talk or face the government's coercive sanctions, notably, a conviction for contempt. The information given in response to a grant of immunity may well be more reliable than information beaten from a helpless defendant, but it is no less compelled. The Fifth and Fourteenth Amendments provide a privilege against *compelled* self-incrimination, not merely against unreliable self-incrimination. Balancing of interests was thought to be necessary in *Harris* and *Hass* when the attempt to deter unlawful police conduct collided with the need to prevent perjury. Here, by contrast, we deal with the constitutional privilege against compulsory self-incrimination in its most pristine form. Balancing, therefore, is not simply unnecessary. It is impermissible.

The Superior Court of New Jersey, Appellate Division, correctly ruled that a person's testimony before a grand jury

---

[9] We express no view as to whether possibly truthful immunized testimony may be used in a subsequent false-declarations prosecution premised on an inconsistency between that testimony and later, nonimmunized, testimony. That question will be presented in *Dunn* v. *United States*, No. 77–6949, cert. granted, 439 U. S. 1045.

under a grant of immunity cannot constitutionally be used to impeach him when he is a defendant in a later criminal trial.[10] Accordingly, the judgment is affirmed.

*It is so ordered.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring.

I join the Court's opinion affirming the judgment in this case, despite my reservations that the decision of the Superior Court of New Jersey, Appellate Division, 151 N. J. Super. 200, 376 A. 2d 950 (1977), certification denied, 75 N. J. 597, 384 A. 2d 827 (1978), may well rest on independent and adequate state grounds.

The privilege against self-incrimination is not set out in the New Jersey Constitution. Its origins are instead to be found in the common law, see *State* v. *Fary,* 19 N. J. 431, 434–435, 117 A. 2d 499, 501–502 (1955), and in statutes. See N. J. Stat. Ann. § 2A:84A–19 (West 1976). Although New Jersey courts have looked to constructions of the Fifth Amendment of the Federal Constitution as a source of illumination for the interpretation of the state privilege, see *In re Pillo,* 11 N. J. 8, 15–17, 93 A. 2d 176, 179–180 (1952), they have also held that the interpretation of that privilege is "a matter of state law and policy, as to which [New Jersey] may impose standards more strict than required by the federal Constitution, which standards will control regardless of the final outcome of the question in the federal sphere." *State* v. *Deatore,* 70 N. J. 100, 112, 358 A. 2d 163, 170 (1976). Cf. *State* v. *Johnson,* 68 N. J. 349, 353, 346 A. 2d 66, 67–68 (1975).

In this context the Appellate Division's decision appears

---

[10] There is discussion in the briefs of the parties regarding the admissibility of statements made by Portash during pre-indictment negotiations with the state prosecutors. We do not understand the opinion of the state appellate court to have dealt with this issue, and nothing said in this opinion bears on it.

to rest on the independent and adequate state ground of N. J. Stat. Ann. § 2A:81–17.2a2 (West 1976). The Division's opinion begins by reciting the statute *in toto,* labeling it as "[t]he statutory authority for the State's grant of immunity to defendant." 151 N. J. Super., at 204, 376 A. 2d, at 952. The opinion states that "[t]he question is whether the State should be required to honor its promise, *expressed in its statute . . . ,* not to use the testimony compelled in any subsequent criminal proceeding against the defendant . . . ." (Emphasis supplied.) *Id.,* at 207, 376 A. 2d, at 954. Under these circumstances the Appellate Division's references to decisions interpreting federal constitutional law seem to be mere analogies, illuminating the Division's ultimate construction of N. J. Stat. Ann. § 2A:81–17.2a2.[1] Logically, interpretations of the Fifth Amendment can at most serve as guidance to New Jersey's interpretation of its own statute.[2] It is also of no little significance that, although the State rests its case heavily on *Harris* v. *New York,* 401 U. S. 222 (1971), see Brief for Petitioner 38–39, the Supreme Court of New Jersey has recently held that the state privilege against self-incrimination may well be "stricter" than that required by *Harris.* See *State* v. *Deatore, supra,* at 116, 358 A. 2d, at 172.

But the Court reads the New Jersey court's opinion as resting on the Federal Constitution. That reading would not have been possible had the New Jersey court's opinion in this case been as explicit as in *Deatore.*[3] However, since I fully agree

---

[1] The immunity statute at issue in this case, N. J. Stat. Ann. § 2A:81–17.2a2 (West 1976), is "self-executing," *State* v. *Vinegra,* 134 N. J. Super. 432, 440, 341 A. 2d 673, 677 (1975), and therefore, as one New Jersey court put it, a "defendant's Fifth Amendment protection is derived from the statute." *Id.,* at 439, 341 A. 2d, at 677.

[2] There is no suggestion, of course, that New Jersey's interpretation of its statute violates the guarantees of the Fifth Amendment of the Federal Constitution.

[3] "We reach that conclusion as a matter of state law and policy . . .

with the Court's disposition of the federal constitutional question, I shall not further press the point but join the Court's opinion.

MR. JUSTICE POWELL, with whom MR. JUSTICE REHNQUIST joins, concurring.

I concur in the Court's opinion, and add these comments.

As stated by the Court, New Jersey makes two arguments in support of its request for reversal. First, it insists that, because Portash did not take the witness stand, his immunized testimony was not used against him and he therefore cannot complain of a violation of his Fifth Amendment privilege. The preferred method for raising claims such as Portash's would be for the defendant to take the stand and appeal a subsequent conviction, if—following a claim of immunity—the prosecutor were allowed to use immunized testimony for impeachment. Only in this way may the claim be presented to a reviewing court in a concrete factual context. Moreover, requiring that the claim be presented only by those who have taken the stand will prevent defendants with no real intention of testifying from creating artificial constitutional challenges to their convictions.[1]

This is a state case, however, in which the New Jersey Appellate Division apparently accepted the procedure followed by the trial court and treated the constitutional question as having been properly presented. I agree with the Court that this procedural question was within the authority of the state court to decide.[2]

---

regardless of the final outcome of the question in the federal sphere." 70 N. J., at 112, 358 A. 2d, at 170.

[1] Criminal defendants, as an aid to determining trial strategy, no doubt would prefer to be told in advance of trial whether prior testimony may be used to impeach if they take the stand. But there is no constitutional requirement that defendants be given such a ruling at a time when only a hypothetical question can be presented.

[2] Accordingly, the Court need not, and, as I read its opinion, does not

The State also argues, quite apart from the procedural context in which the question arises, that immunized grand jury testimony may be used to impeach a criminal defendant's testimony at trial. The Court correctly rejects this argument, ruling that the coercing of Portash to testify before the grand jury constituted a classic case of "compelling" a defendant to be a witness against himself. See *Kastigar* v. *United States*, 406 U. S. 441, 453 (1972).

The Court has referred to two quite different interests in determining whether the Fifth Amendment permits a defendant's statements to be used against him at trial. In *Harris* v. *New York*, 401 U. S. 222 (1971), the Court emphasized the trustworthiness of a suspect's statements made to police, noting that there was no indication that the statements were "coerced or involuntary." Similarly, here there is no reason to question the veracity of the respondent's grand jury testimony. The Court today recognizes, however, that the privilege against self-incrimination protects against more than just the use of false or inaccurate statements against a criminal defendant. In addition, the Fifth Amendment, by virtue of its incorporation through the Fourteenth Amendment, prohibits a State from using compulsion to extract truthful information from a defendant, when that information is to be used later in obtaining the individual's conviction.

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, dissenting.

The Court in this case reaches out to decide an important constitutional question even though that question is presented in the context of an abstract dispute over a hypothetical ruling of the trial court. For me, the facts present too remote and speculative an injury to federally protected rights to support the exercise of jurisdiction by this Court. Indeed,

decide whether it would regard the constitutional issue as having been properly presented if this case had arisen in federal court.

464

examination of the record reveals for me that the Court decides today a question different from the one the trial court considered. This demonstrates how far afield we range when we cut loose from the requirement that only concrete disputes may be decided by this Court. Because I believe the Court is without authority to engage in this type of abstract adjudication of constitutional rights in a factual vacuum, I dissent.

Prior to trial, and again at the close of the State's evidence, respondent Portash attempted to obtain an advance evidentiary ruling from the trial court. Though the precise nature of the ruling respondent sought is a matter of dispute, it related generally to whether and to what extent the State would be permitted to use, during cross-examination of respondent and in the rebuttal phase of its own case, information supplied by respondent under the statutory grant of immunity. When respondent failed to obtain a ruling he considered satisfactory, he refrained from testifying in his own behalf. Accordingly, he did not take the stand at the trial. He was not cross-examined. He gave no answer determined by the trial court to be materially inconsistent with any prior immunized statement on a relevant issue. The State did not seek to impeach him through use of immunized testimony. And the trial court did not rule that the State could do so in response to an inconsistent answer, or that the State could otherwise make use of immunized testimony at trial. In short, because of his failure to take the stand, respondent was never incriminated through the use of the testimony he previously had supplied under the immunity grant.

Even so, the Court takes jurisdiction over this dispute and decides the merits of respondent's claim that it would have constituted a violation of his right under the Fifth and Fourteenth Amendments to be free from compelled self-incrimination had the State used immunized testimony to impeach him, assuming, of course, that he would have taken the stand,

that he would have given materially inconsistent answers to relevant questions, and that the State would have chosen to impeach him with prior immunized testimony. The Court justifies this assertion of jurisdiction, over the State's objection that the dispute is only hypothetical, by announcing that the New Jersey courts decided the issue and held it to be properly presented on appeal. Citing cases such as *Raley* v. *Ohio,* 360 U. S. 423 (1959), and *Jenkins* v. *Georgia,* 418 U. S. 153 (1974), *ante,* at 455, the Court holds that New Jersey's determination that the federal issue properly has been presented is sufficient to allow this Court to decide the issue, notwithstanding respondent's failure to take the stand. "[T]here is nothing in federal law to prohibit New Jersey from following such a procedure," the Court holds, "or, so long as the 'case or controversy' requirement of Art. III is met, to foreclose our consideration of the substantive constitutional issue now that the New Jersey courts have decided it." *Ibid.*

But the State's objection, as I understand it, goes not to whether the federal issue properly was presented in the state courts, but to whether, in light of respondent's failure to testify, the alleged claim is too remote and speculative to support jurisdiction here. As such, resolution of the State's objection turns not on the determination that the New Jersey courts recognized the federal issue as properly presented, but on the determination that there is indeed a federal issue in the case. And this latter determination depends upon whether, as a matter of federal law, there is a sufficiently concrete controversy over the scope of a federal right to support the exercise of jurisdiction by this Court.

The Court tacitly recognizes this, I take it, by conceding, *ante,* at 455–456, that the "case or controversy" requirement of Art. III must be met and by its citation of *Brooks* v. *Tennessee,* 406 U. S. 605 (1972). For in *Brooks,* the dissenters argued that since the defendant had not taken the stand, his right

to be free from compelled self-incrimination had not been infringed, and therefore the defendant had not presented the Court with any federal issue "bearing on the privilege against self-incrimination." *Id.*, at 617. The Court answered that argument by saying that the Tennessee statute in issue imposed a burden on the right to remain silent by penalizing a defendant who asserted that right at the start of his case, and "that penalty constitute[d] the infringement of the right." *Id.*, at 611 n. 6. Thus, in *Brooks,* the Court found that there was a federal issue presented even though the defendant had not taken the stand, since it was the exercise of the right not to testify that the State burdened.

As in *Brooks,* the Court here must believe that there was some infringement of a federal right sufficient to establish a concrete controversy capable of supporting its jurisdiction. But, unlike in *Brooks,* the Court takes care to omit any mention of what federal right was infringed by the hypothetical "ruling" of the trial court. It simply says that New Jersey recognized the issue as having been presented, intimates that the case is within Art. III's case-or-controversy requirement, and proceeds to the merits.

What federal right it is that the "ruling" of the trial court infringed is not easy to ascertain. It would not appear that the right to remain silent, at issue in *Brooks,* was burdened, since respondent asserted that right without suffering any penalty for doing so. Nor did the hypothetical ruling compel respondent to incriminate himself, since it did not force him to take the stand and subject himself to impeachment by use of the immunized testimony. Respondent argues that it was his right to testify in his own behalf that the trial court infringed by threatening him with the possibility that, if he were to testify and if he were to give materially inconsistent answers to relevant questions, the court would permit the State to impeach respondent with his immunized testimony, if the State could do so. This threat, respondent now argues, deterred him from taking the stand in his own behalf, and

thereby constituted an unconstitutional infringement of his right to testify. Brief for Respondent 13.

This appears to be the theory that the Appellate Division proceeded upon, see 151 N. J. Super. 200, 204, 209, 376 A. 2d 950, 952, 955, and it appears to be the most plausible reasoning upon which one could conclude that this case involves an actual, and not hypothetical, invasion of federal rights. As such, the Court today *sub silentio* decides as a matter of federal law that the hypothetical ruling by a state court that it would permit impeachment with immunized testimony in certain circumstances not yet come to pass creates a sufficient infringement on the right to testify as to create a controversy capable of being adjudicated here.

But this claimed burden on the right to testify is too speculative to support the exercise of jurisdiction by this Court over the ultimate dispute concerning the use of immunized testimony. On this record, we cannot tell whether respondent would have taken the stand even had he obtained the ruling he sought from the trial court. The decision by a criminal defendant to testify is often the most important decision he faces in the trial, and it seldom turns on the resolution of one factor among many. Even had respondent taken the stand, there is no assurance he would have given inconsistent answers to questions. Indeed, respondent vigorously has argued, in this Court and in the state courts, that he would not have testified in any manner inconsistently with his immunized testimony. Moreover, even had inconsistent answers been given, the trial court would have had to determine whether the answers were offered in response to relevant and material questions before it would have permitted impeachment. And even then, there is no certainty that the State actually would have sought to use immunized materials to impeach respondent.

In these circumstances, I would hold the dispute as to the use of the immunized testimony to be too remote and speculative to enable this Court to adjudicate it. Cf. *Laird*

v. *Tatum,* 408 U. S. 1 (1972). By finding sufficient contro-
versy to exist in this case to reach the federal issue, the Court
exercises jurisdiction over an abstract dispute of no concrete
significance, and as a result renders an advisory opinion, in-
forming respondent what the State would have been per-
mitted to do or not do had respondent ever taken the stand.

I find this adjudication of an abstract dispute not only to
be beyond the jurisdiction of the Court but to be unwise as
well. At a minimum, as our Brother POWELL notes, *ante,* at
462, a requirement that such a claim be adjudicated on appeal
only when presented by a defendant who has taken the stand
prevents a defendant from manufacturing constitutional chal-
lenges when he has no intention of taking the stand and
testifying in his own behalf. More fundamentally, such dis-
embodied decisionmaking removes disputes from the factual
and often legal context that sharpens issues, highlights prob-
lem areas of special concern, and, above all, gives a reviewing
court some notion of the practical reach of its pronouncements.

Indeed, my examination of the record in this case makes me
suspect that in adjudicating an abstract and academic legal
question the Court has affirmed the reversal of respondent's
conviction on the basis of an issue not even argued by
respondent at the trial level in his attempt to obtain an
advance ruling from the trial court. It is clear to me that
the possible use of immunized testimony to impeach respond-
ent was not at all respondent's concern before the trial court.
At the pretrial hearing respondent's counsel conceded that if
respondent gave materially inconsistent answers, he could be
impeached with the grand jury testimony or prosecuted for
perjury. App. 144a. Rather, respondent was attempting to
obtain an advance ruling from the trial court that the State
could not rely on information gathered from respondent's
immunized testimony in formulating questions for respondent
on cross-examination. His argument to the trial court was
that unless the State could show that it discovered the infor-

mation that formed the basis of its questions from a source independent of his immunized testimony, the Fifth Amendment prohibited the State from asking those questions. And it was in reliance on the trial court's ruling that it would not decide in advance on this request—but would wait until each question was asked to consider this objection—that respondent refused to take the stand.

The record at almost every point supports this interpretation of what it was that respondent sought from the trial court. For example, in the course of conceding that respondent properly would be subject to impeachment with the grand jury testimony if he gave answers at trial materially inconsistent with that testimony, respondent's counsel stated that he "merely want[ed] a ruling from the Court that, *unless the door is opened,* that they are not permitted to use any of [the immunized testimony] by way of cross examination, by way of rebuttal, or by way of cross examination of any of our witnesses, with the one limitation, that I think is inherent, is that except in the event of perjury" (emphasis added). App. 146a. See *id.,* at 143a–148a.

Similarly, when counsel renewed this argument at the close of the State's evidence, the record reveals that his concern was not with impeachment, but with the use of the immunized testimony as a basis for asking questions. Thus, counsel argued that what the immunity statute proscribed was "use [of] the fruits of his testimony to cross examine him in his testimony." *Id.,* at 203a.[1]

---

[1] "Mr. Wilbert [defense counsel]: Your Honor, what they are going to do is attempt to enlarge the cross examination to question him about aspects of that grand jury testimony when he is not inconsistent at all on direct examination with it. They're going to make him inconsistent or make him incriminate himself by the use of the grand jury testimony. . . . If we stay out of the area totally and then *on cross examination they ask him to give an answer that's consistent with his grand jury testimony but which incriminates him, how can that possibly be permitted, your Honor?* . . . [W]hat they're doing there is utilizing that grand jury

Concededly, in the passage the Court quotes, *ante*, at 454–455, the trial court stated that if respondent gave materially inconsistent answers, it would permit impeachment with the immunized testimony. But an examination of the entire discussion from which that quotation is lifted makes it clear that respondent was not seeking a ruling as to impeachment for inconsistent statements, but a limitation on the scope of cross-examination. Thus, just before the quoted exchange, respondent's counsel assured the trial court that "the direct examination will in no way be inconsistent with his grand jury [immunized] testimony," App. 220a, but that the problem concerned the use of "consistent grand jury testimony which is incriminating to convict the man on the stand." *Ibid.* And immediately after the passage upon which the Court relies, respondent waved off the impeachment issue and stated that the problem that concerned him was the use by the State of information obtained from the immunized testimony to force respondent to give answers on the stand that would incriminate him.[2]

The trial court refused to rule in advance on this attempt to limit cross-examination, and it was this refusal that respondent claimed prompted his refusal to testify. *Id.,* at 243a. Before the Appellate Division, however, the dispute was transmuted into one over the ability of the State to impeach respondent with the immunized testimony. It was on that issue that the conviction was reversed. And it is on

testimony not to show an inconsistency but to create consistent incrimination . . . ." App. 203a–204a (emphasis added).

See *id.,* at 168a, 173a, 192a–193a, 202a–203a.

[2] "Mr. Wilbert: . . . . If they're allowed to open the grand jury testimony of Mr. Portash by asking him the questions that they only gained knowledge of in his grand jury testimony and when he didn't testify about it on direct, I submit it is an absolute erroneous use under the law, erroneous use of that grand jury testimony and that's what I'm—that's why I'm here seeking clarification, that's what it's all about." *Id.,* at 228a. See *id.,* at 225a, 228a, 230a–231a.

that issue that this Court affirms that reversal. Thus, because the Court reaches out to decide a theoretical legal question presented in an abstract setting, it permits respondent to obtain a favorable ruling from this Court on an issue of federal law that he did not assert in the trial court, and that did not form the basis for his refusing to testify in that court. And I assume respondent will be free at a new trial to renew his original argument, that the State is forbidden to use what it learned from the immunized testimony in formulating questions on cross-examination. This illustrates, I think, the problems the Court will encounter in every case in which it abandons the requirement that such an issue be presented for resolution only in the context of a concrete dispute about its actual operation at trial.

If this case presented simply the question whether state law had viewed the federal issue as properly presented, I could understand better the Court's desire to reach the federal issue. But though a State may decide whether a federal issue actually present in the case properly was brought to the attention of its own courts for adjudication, *e. g., Raley* v. *Ohio,* 360 U. S. 423 (1959), it never should transform an abstract dispute about a federal constitutional right into a case or controversy capable of being adjudicated in this Court simply by deciding that federal issue. *Doremus* v. *Board of Education,* 342 U. S. 429, 434–435 (1952). Otherwise, a State, by ruling on a purely hypothetical legal question in the context of reviewing a criminal conviction, could confer Art. III jurisdiction on this Court where the facts do not support the existence of a case or controversy.

I would require that respondent take the stand and actually assert the rights he seeks to vindicate in the context of an actual attempt by the State to use the immunized testimony. Because the Court does not require this, I dissent.