In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00267-CR**
_____

**RAY LEVINE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

_____

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 12-15106**

_____

**MEMORANDUM OPINION**

A jury convicted appellant Ray Levine of indecency with a child, and the trial judge assessed punishment at thirty years of confinement.[1] In two appellate issues, Levine challenges the exclusion of testimony from a witness and the admissibility of extraneous offenses. We affirm the trial court's judgment of conviction.

_____

[1]In addition to alleging the primary offense of indecency with a child, the indictment alleged that Levine had been previously convicted of robbery and murder.

1

## THE EVIDENCE

The victim, T.A., testified that she was eleven years old when the offense occurred. T.A. explained that she, her brother, and her mother were staying at Levine's father's home, where her mother rented a room. T.A. testified that one afternoon, she entered the house crying after sustaining a minor injury to her lip while playing with her brother. According to T.A., Levine asked her what was wrong then,

> put his hands on my face and he kissed me about three times and the third time he . . . sucked on my bottom lip and I could feel his teeth and he told me whatever we do stays between us[,] and you can't tell anyone, not even your mom or dad.

T.A. explained that Levine's behavior made her uncomfortable. T.A. told her brother what happened, and her brother took her into their room and locked the door.

Levine later knocked on the door and asked T.A.'s brother to buy a lottery ticket at the store. T.A. explained that after her brother left to go to the store, Levine called her to the sofa to watch television with him. T.A. laid down beside Levine on the sofa, and Levine rubbed T.A.'s back, wrapped his leg around her, rubbed T.A.'s shoulders, touched her breasts, and simulated sexual intercourse by rubbing against T.A. T.A. testified that she believed Levine did these things to arouse or gratify his sexual desire.

When T.A.'s brother returned, he saw T.A. getting up from the couch, and she told him what had happened. T.A. also told her mother, V.B., what had occurred, and V.B. described T.A. as "tearing up and nervous[.]" V.B. then called the authorities, and T.A. provided a written statement to the police.

V.B. testified that she grew up with Levine and had been sexually involved with him in the past. V.B. explained that she was not sexually involved with Levine while she and her children were living in the house with Levine. V.B. testified that she and Levine were "just childhood friends[,]" and they had no issues of heartbreak, jealousy, or retribution. Defense counsel did not question V.B. regarding her relationship with Levine during cross-examination.

T.A.'s brother, I.B., also testified at trial. While cross-examining I.B., defense counsel stated, "[Y]ou understand that this is extremely serious, don't you? . . . You understand that what's happened in the last two and a half years is that my client has been sitting in jail. Do you understand that?" Outside the presence of the jury, the prosecutor argued that defense counsel's comments had opened the door to evidence of Levine's "blue warrant parole hold." The prosecutor went on to add, "And if we want to get into that, he just mentioned why he has been in jail. Well, if you want to talk about why he has been in jail and that he didn't get a bond is because he is on a murder parole hold, a blue warrant." The trial court ruled that

3

defense counsel had not opened the door, but was "very close" to having done so. The trial judge warned defense counsel, "don't say anything else about it unless you expect for it to open that door."

Officer Mindy Erickson of the Beaumont Police Department testified that after learning of T.A.'s outcry to V.B., she spoke with T.A. herself. Officer Erickson explained that T.A. "was looking at the ground a lot. She had a hard time making eye contact with me. She seemed kind of withdrawn, . . . she seemed very uncomfortable. She seemed scared." Detective Darrell Lebeouf of the Beaumont Police Department's special crimes division testified that T.A.'s case was assigned to him, and he went with T.A. to the Garth House to be interviewed. Lebeouf also interviewed V.B. Lebeouf testified that he believed Levine committed indecency with a child. Nancy Blitch, a forensic interviewer at Garth House, testified that she interviewed T.A., and she explained that T.A. answered all of the questions posed to her and was "very forthcoming[.]"

The State rested at the conclusion of Blitch's testimony, and defense counsel had Levine state on the record that after hearing the evidence in the case, Levine and counsel had agreed that Levine should not testify on his own behalf. Defense counsel then made an offer of proof as to potential witness Lorena Horton. Horton stated that she met Levine online and they began dating. Horton explained that she

4

met V.B. and was aware that V.B. and Levine previously had a sexual relationship. Horton stated as follows: "One day I was cooking in the kitchen with Ray's father and Ray was sitting on the couch. . . . So, I could hear, but I didn't see. And suddenly[,] I heard [V.B.] screaming: Don't be doing me like that, Ray. I ain't one of your bitches." Horton testified that V.B. also threw something. Horton opined that her presence had upset V.B., and she explained that V.B. later apologized and told Horton that she and Levine were merely good friends. Horton testified that her encounter with V.B. occurred approximately one month prior to the offense against T.A.

Defense counsel argued that Horton's testimony was admissible to show that V.B. had a motivation to have T.A. fabricate the charge against Levine, but the trial court declined to allow Horton to testify. Defense counsel then argued, "[m]y thought process is it seems to me I am now put in a position where I . . . at least have an inclination for changing my mind about whether or not to put my client on the stand. I think that puts me in a bad position." The trial judge responded that she would be inclined not to admit evidence of the robbery, but "the murder conviction would probably become admissible if [Levine] were to take the stand." Defense counsel stated, "just so the Court is clear, my key objection to that is that we filed in November of 2013 a request for notice under 404(b), 609(f), . . . and the notice

5

came within 15 minutes of picking a jury or within an hour of picking a jury."[2] The trial judge noted that the charging instrument itself listed the murder conviction and ruled that Levine had received reasonable notice. The defense then rested.

## ISSUE ONE

In his first appellate issue, Levine argues that the trial court erred by excluding from evidence the testimony of Lorena Horton. Specifically, Levine asserts that Horton's testimony did not constitute hearsay because it was not offered to prove the truth of the matter asserted and because it was offered as evidence of V.B.'s feelings toward Levine and "her motive to fabricate the story."

We review a trial court's ruling to admit or exclude evidence under an abuse of discretion standard. *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009); *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). Absent a clear abuse of discretion, we will not disturb the trial court's decision to admit or exclude testimony. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000). A trial court abuses its discretion when its decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *Weatherred*, 15 S.W.3d at 542. Error may not be predicated upon a ruling that admits or excludes evidence unless a

---

[2]The notice to which defense counsel was referring was apparently the State's notice of its intent to use Levine's prior convictions for enhancement at punishment and notice of intent under Rules 404b, 609f, and article 37.07, which was filed during the trial.

6

substantial right of the party is affected. Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Reversal is not appropriate if, after examining the record as a whole, we have fair assurance that the error did not influence the jury, or influenced the jury only slightly. *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001).

During his opening statement, defense counsel argued, "do the witnesses have a reason for telling the story that they are telling? What's really going on here?" As discussed above, the State elicited testimony from V.B. concerning her relationship with Levine during direct examination. However, defense counsel did not question V.B. at all about the relationship during cross-examination. Defense counsel again asserted during closing argument that V.B. might have fabricated the story. During the offer of proof, Horton indicated that the substance of her testimony would have amounted to an account of hearing words exchanged between Levine and V.B., as well as Horton's inference that V.B. was upset at Horton's presence. Viewing the record as a whole, we cannot say that the trial court erred by refusing to admit testimony from Horton. *See Weatherred*, 15 S.W.3d at 542. In addition, after examining the record as a whole, we have fair

assurance that the exclusion of Horton's testimony either did not influence the jury or influenced the jury only slightly. *See Schutz*, 63 S.W.3d at 444; *see also* Tex. R. Evid. 103(a); Tex. R. App. P. 44.2(b). We overrule issue one.

ISSUE TWO

In his second issue, Levine complains of the trial court's ruling that his murder conviction would become admissible if he had decided to testify. As explained above, no extraneous offense evidence was actually admitted, and the essence of Levine's complaint on appeal is (1) he did not receive adequate notice of the State's intent to use the extraneous offenses and (2) the trial court's ruling that the extraneous murder offense evidence would be admissible prevented him from testifying. With respect to Levine's complaint regarding notice, we note that the State need not provide notice of extraneous offense evidence not presented during its case in chief. *See Jaubert v. State*, 74 S.W.3d 1, 4 (Tex. Crim. App. 2002).

We now turn to Levine's argument that the trial court's ruling regarding the admissibility of extraneous offense evidence prejudiced his defense and "effectively prevented Levine from testifying in his own defense[.]" When a defendant elects not to testify, a reviewing court has no way to know whether the State would have sought to impeach him with inadmissible extraneous offense

evidence. *Ramirez v. State*, 336 S.W.3d 846, 849 (Tex. App.—Amarillo 2011, pet. ref'd) (citing *Luce v. United States*, 469 U.S. 38, 42 (1984)). "'The preferred method for raising claims such as [appellant's] would be for the defendant to take the stand and appeal a subsequent conviction. . . . Only in this way may the claim be presented to a reviewing court in a concrete factual context.'" *Luce*, 469 U.S. at 43 (quoting *New Jersey v. Portash*, 440 U.S. 450, 462 (1979)). The record reflects that Levine made the decision not to testify after conferring with counsel. In this case, as in *Luce* and *Ramirez*, we conclude that because Levine did not testify, he failed to preserve his claim of improper admission of extraneous offense evidence as impeachment. *See id.*; *Ramirez*, 336 S.W.3d at 850. Accordingly, we overrule issue two and affirm the trial court's judgment of conviction.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on April 6, 2016
Opinion Delivered June 1, 2016
Do Not Publish

Before McKeithen, C.J., Horton and Johnson, JJ.