414 F.2d 1235
 Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Appellant-Cross Appellee,
v.
Pablo H. LaSALLE, Appellee-Cross Appellant.
Pablo H. LaSALLE, Appellee-Cross Appellant,
v.
Louie L. WAINWRIGHT, Director, Division of Corrections, State of Florida, Appellant-Cross Appellee.
 No. 26345.
 United States Court of Appeals Fifth Circuit.
 August 21, 1969.
 Rehearing Denied September 26, 1969.
 
 Earl Faircloth, Atty. Gen. of Florida, Tallahassee, Fla., Charles W. Musgrove, Asst. Atty. Gen., West Palm Beach, Fla., for appellant.
 Paul Siegel, Alfred Feinberg, Miami, Fla., for appellee.
 Before JOHN R. BROWN, Chief Judge, and GEWIN and GOLDBERG, Circuit Judges.
 JOHN R. BROWN, Chief Judge:
 
 
 1
 In this habeas corpus case the State appeals from the District Court's decision granting the writ and directing that the prisoner LaSalle either be released or retried within a reasonable time. The basis for the District Court's decision was the use at LaSalle's State trial of incriminating statements taken from him during interrogations at which he was not affirmatively accorded a Sixth Amendment right to counsel. In addition, LaSalle has filed a cross-appeal from that part of the District Court's judgment rejecting another of his asserted grounds for granting the writ. While we differ to some degree with the District Court's reasoning, we affirm its judgment granting the writ.
 
 
 2
 LaSalle's State trial began on May 3, 1965, and he was convicted of second degree murder and sentenced on May 4.[1] This means that the Supreme Court's decision in Escobedo v. Illinois[2] is applicable to this case.[3] The Federal District Judge held that under Escobedo LaSalle "did have a right to the assistance of counsel, and therefore a right to be effectively warned thereof, during interrogation." He found as a fact that no such warning was given. Since violation of this right rendered inadmissible the statements obtained by the police and used at the State trial, it followed that the writ had to be granted. On appeal the State contends that the District Judge erred in two respects: (1) holding that Escobedo required a warning of the right to counsel,[4] and (2) holding that the Escobedo principle was available to LaSalle in the absence of a request for counsel.[5]
 
 
 3
 In our view, however, we need not rule upon these contentions in the determination of this case. Rather, from other findings made by the District Court, the record supports the conclusion that under the circumstances of this case the statements taken from LaSalle during the post-arrest interrogations should have been excluded from the trial because they were not the product of his free and rational choice. Because we find this independent basis supporting the District Court's decision, we need not rule upon the correctness of this specific reasoning which led the District Court to the same result.[6]
 
 
 4
 As the Supreme Court has recently stated, "[t]he question whether a confession was voluntarily made necessarily turns on the `totality of the circumstances' in any particular case * * *." Boulden v. Holman, 1969, 394 U.S. 478, 480, 89 S.Ct. 1138, 1140, 22 L.Ed.2d 433, 437. An independent examination of the entire record[7] convinces us that, although the question may be a close one, the statements here challenged cannot be considered voluntary.
 
 
 5
 LaSalle was an illiterate, Puerto Rican farm worker, age twenty-six, who had little formal education,[8] could barely read or write in Spanish, and was, at best, unable to communicate effectively in the English language. Whatever doubt there might be about LaSalle's real ability to understand and communicate in English when he wanted to, or when it was to his advantage to do so,[9] the actions of the Florida officers affirm positively their own contemporaneous evaluation. It is uncontradicted that the language barrier between the interrogators and the prisoner resulted in the termination of two questioning sessions, the second in order that an interpreter might be obtained. Further, insofar as this record shows, he had not had any prior dealings with the police, and thus there was no indication that he was familiar with police investigative practices.
 
 
 6
 The circumstances under which LaSalle's post-arrest statements were obtained may be summarized briefly. LaSalle was arrested in Fort Myers, Florida, around 10:00 a. m. on April 6, 1964. He was then taken to the Fort Myers jail and placed in a bare cell. Shortly thereafter, he was turned over to two police officers who immediately began questioning him about the murder bulletin they had received from Miami.[10] Despite an admitted language problem, the officers testified that LaSalle denied the crime, denied coming from Miami, and even denied his own identity.
 
 
 7
 One factor giving ample justification to the District Judge's implied finding of involuntariness is the conflict between the interrogating officers themselves with respect to the question whether any — the word is "any" — constitutional warnings were given at that time. One officer testified that LaSalle was advised of his rights, including his right to obtain a lawyer (although not that he would be furnished with one).[11] The other officer testified that LaSalle was not advised of any of his rights. Even if — and the "if" is a big one — some warnings were administered, two things are reasonably apparent. First, such warnings were given by English-speaking officers who shortly thereafter found it necessary to terminate their interrogation because of the language barrier existing between themselves and the prisoner. Second, they were so superficial that among the participants they were either unaware of the necessity for them or whether they had been given.
 
 
 8
 When LaSalle was not being questioned, he was kept in a cell which he claims had no bed or blanket. Further, at the Federal habeas hearing he testified, without contradiction, that he was not given food or water during the first twenty hours he was in custody.
 
 
 9
 Later that day, about 9:00 p. m., two other police officers arrived from Miami. Together with one of the officers who had questioned LaSalle earlier, and perhaps another,[12] they began interrogating him a second time in English. It is plain that LaSalle was not advised of his constitutional rights at the time of this interrogation. The officers again had difficulty understanding him, to the extent that an interpreter had to be obtained.[13]
 
 
 10
 The interpreter, Ojah Sims, finally arrived and participated in further interrogation of LaSalle.[14] Sims, too, testified at the second State trial that he had not administered any constitutional warnings and, of course, that means that no such warnings were given by officers to the accused through Sims as an interpreter. Sims testified that after he read the arrest warrant to LaSalle and showed him the knife, LaSalle confessed that he had used the knife to kill a man in Homestead. LaSalle reputedly gave some of the details of the killing.
 
 
 11
 The following day, April 7, about 10:00 a. m. the Miami police officers returned with LaSalle to Miami. Upon their return, the same Justice of the Peace who had earlier issued the arrest warrant "came over and warned [LaSalle] of his legal rights." But the record does not reveal what rights were included in the warning, whether it was given in English or Spanish, or whether it was understood by the prisoner.
 
 
 12
 For some reason or another the officers were unsatisfied, because about 4:30 that afternoon LaSalle allegedly confessed a second time — or perhaps a third time (see note 13, supra) — in response to questions posed in English by a third Miami police officer and translated into Spanish by still a fourth officer. This time he was warned in Spanish of his right to remain silent, but no warning concerning counsel was given. Again he confessed to a killing — this time giving a somewhat different version of the events from that given in his earlier confession.
 
 
 13
 In short, the record is chock-a-block with glaring inconsistencies. The testimony of different critical witnesses often conflicts, and there are many internal contradictions between the stories of the same witness given at different times. And on their stories the accused did, and the accused did not, admit the act, the crime, the presence, or the flight. Concentrated as these events were, on April 6 and 7, there was consequently a complete lack of indication that the confusion, ignorance, or lack of understanding which existed at an earlier time had dissipated when the last and paper-perfect admission came out.
 
 
 14
 Recent cases in which the Supreme Court has held challenged confessions "involuntary" involve a variety of factual circumstances. For example, one extreme situation was characterized by the Court as "a shocking display of barbarism," Brooks v. Florida, 1967, 389 U.S. 413, 415, 88 S.Ct. 541, 542, 19 L.Ed.2d 643, 645, another as "gross coercion," Beecher v. Alabama, 1967, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35, 39. Yet it is clear that brutally coercive factors, such as physical abuse or threats of physical violence, need not be present to support a determination of involuntariness.
 
 
 15
 The combination of events here justifies the conclusion that the confession was not the product of a free choice.[15] LaSalle was held in continuous incommunicado custody for about 12 hours before he confessed for the first time.[16] The ultimate confession followed one or two previous denials[17] made in interrogations during which simple communication was the real problem. And, apart from its status as an independent per se ground, a fact of critical importance is the failure effectively to advise him of his right to counsel. And in some of the interrogations leading to some of his confessions, he was not even advised of his right to remain silent.[18] To these must be added the facts that he was an illiterate man with little formal education,[19] and unversed in police practices and the language of the Country.
 
 
 16
 Therefore viewing these circumstances in their totality, we are impelled to the conclusion that LaSalle's first confession cannot be considered voluntary. Although there is some indication that perhaps LaSalle was given better warnings before his second — or third — confession, the record will not permit a finding that there had been a "break in the stream of events" from the first invalid confession on April 6 to the later confessions of the following afternoon "sufficient to insulate" the final events "from the effect of all that went before." Clewis v. Texas, supra note 17, 386 U.S. at 710, 87 S.Ct. at 1340, 18 L.Ed.2d at 426.[20]
 
 
 17
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 LaSalle had actually undergone a prior trial, which had ended in a hung jury. See note 13,infra and related text.
 
 
 [2]
 1964, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977
 
 
 [3]
 Because LaSalle's trial began before the date of the decision in Miranda v. Arizona, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694, theMiranda rules are not directly applicable here. Johnson v. New Jersey, 1966, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. They are nonetheless, relevant on the issue of voluntariness. Clewis v. State of Texas, 1967, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423.
 
 
 [4]
 In Johnson v. New Jersey,supra, the Supreme Court noted the "precise holding" of Escobedo:
 "Apart from its broad implications, the precise holding of Escobedo was that statements elicited by the police during an interrogation may not be used against the accused at a criminal trial, `[where] the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent * * *.'"
 384 U.S. at 733-734, 86 S.Ct. at 1781, 16 L.Ed.2d at 892.
 
 
 [5]
 See note 4,supra.
 
 
 [6]
 Cf. Greenwald v. Wisconsin, 1968, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77, a post-Escobedo case in which the Supreme Court held the challenged confession "involuntary" and declined to rule on the question whether Escobedo would, in itself, require reversal of petitioner's convictions.
 We note, however, as the Supreme Court recognized in Miranda, the Esco- bedo decision "has been the subject of judicial interpretation and spirited legal debate," and the "courts, in assessing its implications, have arrived at varying conclusions." 384 U.S. at 440, 86 S.Ct. at 1610, 16 L.Ed.2d at 704. This Court has previously held, in a pre-Miranda, post-Escobedo case, that an inculpatory statement does not become inadmissible solely because the arresting officers failed to warn the suspect of his right to remain silent. In that case we directed the court on remand to examine the "totality of circumstances" to determine whether the challenged statement was coerced, "giving appropriate weight to the failure to warn as a relevant factor." State of Texas v. Payton, 5 Cir., 1968, 390 F.2d 261, 267-270. See also Love v. State of Alabama, 5 Cir., 1969, 411 F.2d 558.
 
 
 [7]
 The record, which contains the Federal habeas papers, the testimony in the Federal habeas hearing, and the transcripts from both State trials, is a large one — comprising 640 pages in all
 
 
 [8]
 Although the record is not entirely clear, it appears that LaSalle reached, at most, the fifth grade
 
 
 [9]
 Whether and to what extent LaSalle could understand English is disputed. As might be expected, LaSalle testified at the Federal habeas hearing that he understood none of the English spoken to him by the interrogating officers. The officers, on the other hand, testified at the State trial that he appeared to understand the English questions directed to him during the interrogation sessions
 
 
 [10]
 This was the bulletin that had led to LaSalle's arrest
 
 
 [11]
 This officer's testimony on another point — the time of the second interrogation — is uniformly contradicted by all the other participants in that event
 
 
 [12]
 The State trial record is not entirely clear whether three or four officers were present
 
 
 [13]
 Exactly when LaSalle confessed for the first time is uncertain. At the second trial (see note 1,supra) one of the Miami officers testified that LaSalle admitted the crime in English before the interpreter arrived, while at the first trial the same man had said that LaSalle had denied the crime up to the time the interpreter came. If he confessed once in response to English questions, then there was a total of three statements.
 
 
 [14]
 Sims' interpreting competence was the subject of some question in the State Courts. This is but another instance of the potential "understanding gaps" that plague this record
 
 
 [15]
 As the Second Circuit stated in United States ex rel. Hughes v. McMann, 1968, 405 F.2d 773, 776:
 "The test `has become increasingly meticulous through the years,' Johnson v. New Jersey, supra, 384 U.S. at 730, 86 S.Ct. at 1779, and old cases upholding confessions, even Supreme Court cases not expressly overruled, are hence of little assistance."
 
 
 [16]
 See Sims v. Georgia, 1967, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634
 
 
 [17]
 See Greenwald v. Wisconsin, 1968, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77; Clewis v. State of Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423; Darwin v. Connecticut, 1968, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630
 
 
 [18]
 See Davis v. North Carolina, 1966, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895; Greenwald v. Wisconsin,supra note 17; Clewis v. State of Texas, supra note 17.
 
 
 [19]
 See Sims v. Georgia, 1967, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634
 
 
 [20]
 Because we have sustained LaSalle's primary contention on the confession issue, we decline in the interest of judicial administration to rule on his cross-appeal on the search and seizure issue. This is because it has not earlier been presented to the Florida Court, see Boyer v. City of Orlando, 5 Cir., 1968, 402 F.2d 966, and it is not certain that on any retrial the matter will come up. In the event Florida chooses to retry him, these questions will be for that Court to consider in the first instance