**Raul VARGAS**

v.

**John BROWN.**

**Civ. A. No. 81–0017.**

United States District Court, D. Rhode Island.

April 15, 1981.

James MacFadyen, III, Barbara Hurst, Asst. Public Defenders, Providence, R. I., for plaintiff.

Kathryn A. Panciera, Appellate Division, Dept. of the Atty. Gen., R. I., Providence, R. I., for defendant.

## OPINION AND ORDER

PETTINE, Chief Judge.

■ Raul Vargas, currently serving a life sentence for first degree murder in the Adult Correctional Institutions, has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He argues that he was denied due process by the state trial court's refusal to enquire into the voluntariness of a prior statement made by one Eduardo Guitard—a witness at trial—before permitting the prosecution to use that statement in impeaching Guitard's testimony. Petitioner properly presented this issue to the Rhode Island Supreme Court on direct appeal. That Court, although apparently agreeing with him that "there was a question whether the statement was in fact voluntarily given," held that the Constitution does not mandate a separate judicial inquiry into the voluntariness of a witness' prior statement when the statement is introduced only for purposes of impeachment. *State v. Vargas*, 2 R.I.Adv.Sh. 504, 420 A.2d 809, 813–14 (1980). Noting that this conclusion squarely conflicts with the holding of the Court of Appeals for the First Circuit in *La France v. Bohlinger*, 499 F.2d 29, *cert. denied*, 419 U.S. 1080, 95 S.Ct. 669, 42 L.Ed.2d 674 (1974), petitioner seeks habeas relief in this Court.[1]

*La France* was a habeas case that raised the precise issue presented here. Writing for the Court, Judge Campbell concluded that a defendant's Fourteenth Amendment due process rights are violated by the prosecution's use of a witness' prior involuntary statement to impeach the credibility of that

---

1. Petitioner's request for rehearing was denied by the Rhode Island Supreme Court on October 23, 1980. He need not have petitioned the United States Supreme Court for certiorari before seeking habeas relief. *Makarewicz v. Scafati*, 438 F.2d 474, 477 (1st Cir.), *cert. denied*, 402 U.S. 980, 91 S.Ct. 1685, 29 L.Ed.2d 145 (1971), *citing Fay v. Noia*, 372 U.S. 391, 435–38, 83 S.Ct. 822, 847–48, 9 L.Ed.2d 837 (1963).

witness. If the defendant raises a genuine issue as to facts which, if established, would warrant a finding of involuntariness, then the trial judge must hold a hearing on the voluntariness issue before permitting the witness' statement to be used for any purpose. 499 F.2d at 35–36. The failure to hold such a hearing presents a cognizable habeas claim.

In opposing petitioner's claim in this case, the State relies on four main arguments:[2] 1) petitioner did not properly raise the issue at trial; 2) the issue was fully and fairly considered by the Rhode Island Supreme Court; 3) the *La France* approach has not been endorsed by the Supreme Court and has been rejected by some courts; and 4) even assuming its correctness as a statement of law, *La France* does not mandate a hearing in this case. Each of these arguments will be addressed in turn.

### Failure Properly to Raise the Issue at Trial

Although conceding that petitioner's counsel objected to use of Guitard's prior statement at the time it was offered on grounds that it might have been involuntary, *see* Tr. at 46–47, the State contends that the due process issue was not properly raised at trial. It states that petitioner's counsel never presented a "Fourteenth Amendment argument" to the trial justice, and that counsel never explicitly requested an evidentiary hearing on voluntariness. Assuming *arguendo* that petitioner did not sufficiently pinpoint at trial the constitutional claim he now presses,[3] it cannot be gainsaid that the claim was presented fully and specifically to the Rhode Island Supreme Court. Indeed, the State's second argument for denial of this petition rests on that Court's thorough exploration and actual decision of the issue.

The principles of comity codified as the exhaustion requirement of 28 U.S.C. § 2254(b) & (c) mandate that the state court be presented with "the same claim [the petitioner] urges on the federal courts", so that it may have a "fair opportunity to consider" that claim and "to correct the asserted constitutional defect". *Picard v. Connor*, 404 U.S. 270, 276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). These federalism concerns would seem amply satisfied if the highest state court has been able to pass on the issue, regardless of whether every lower level of the state court system was asked its opinion along the way. No one has suggested that the Rhode Island Supreme Court was incapable of rectifying any error it found in Vargas' conviction. If that Court was willing to overlook possible deficiencies in petitioner's position at trial and reach his due process claim on appeal, this Court certainly need not concern itself with whether he committed some procedural default. *See New Jersey v. Portash*, 440 U.S. 450, 455, 99 S.Ct. 1292, 1295, 59 L.Ed.2d 501 (1979); *Castaneda v. Partida*, 430 U.S. 482, 485 n.4, 97 S.Ct. 1272, 1275 n.4, 51 L.Ed.2d 498 (1977); *United States ex rel. Cuomo v. Fay*, 257 F.2d 438, 441 (2d Cir. 1958), *cert. denied*, 358 U.S. 935, 79 S.Ct. 325, 3 L.Ed.2d 307 (1959).

### Consideration of the Issue by the Rhode Island Supreme Court

The State also presses this Court to deny the petition on grounds that Vargas' due process claim was "fully and adequately discussed and resolved by the Rhode Island Supreme Court." Memorandum at 25. Conceding this to be true, this Court must remind the State that the deference to state

---

**2.** The State has devoted a considerable portion of its brief to defending the trial justice's rulings on impeachment of a witness by the party who called him, and on use of prior inconsistent statements. These points, involving primarily evidentiary matters within the province of state law, are irrelevant to this proceeding.

**3.** Defense counsel repeatedly objected to attempts to bring in the prior statement. *See, e.* g., Tr. at 46–47, 89, 91, 92, 94. He explicitly questioned its voluntariness, Tr. at 46–47, although he did not attempt to counter the trial justice's concerns about standing by articulating the *La France* reasoning. *See* Tr. at 64–65. Despite this less-than-perfect advocacy, the Court is of the opinion that the issue was adequately raised at trial. *See* text *infra* at 275.

court determinations which is required in habeas proceedings refers only to questions of *fact*. It is axiomatic that "a federal habeas judge must independently apply the correct constitutional standard to the historical facts underlying petitioner's constitutional claim regardless of how fairly and completely the claim has been litigated in the state courts." *Leavitt v. Howard*, 462 F.2d 992, 995 (1st Cir.), *cert. denied*, 409 U.S. 884, 93 S.Ct. 175, 34 L.Ed.2d 140 (1972). *Accord Townsend v. Sain*, 372 U.S. 293, 318, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963); *Davis v. Heyd*, 479 F.2d 446, 449 (5th Cir. 1973). This does not mean, of course, that the federal court should not give thoughtful consideration to the state court's judgment on legal questions. *Patton v. North Carolina*, 256 F.Supp. 225, 230 (W.D.N.C.1966), *aff'd*, 381 F.2d 636 (2d Cir. 1967), *cert. denied*, 390 U.S. 905, 88 S.Ct. 818, 19 L.Ed.2d 871 (1968). Ultimately, however, the state court's views carry only persuasive power. In habeas, there is no deference to all but "clearly erroneous" conclusions of law. *Cf.* 28 U.S.C. § 2254(d) (setting out this standard for questions of fact).

This Court is not insensitive to the fact that the potential for conflicting rulings by the state and federal courts, which inheres in every § 2254 case, is fully realized in this case. That a single federal judge can overturn a conviction by accepting an argument thoughtfully considered and decisively rejected by the several judges of the highest state court may appear arrogant and unseemly. However, before branding this case as antithetical to all the principles that inspire "our federalism", it is well to recall Justice Frankfurter's admonition:

> Insofar as [habeas] jurisdiction enables federal district courts to entertain claims that State Supreme Courts have denied rights guaranteed by the United States Constitution, it is not a case of a lower court sitting in judgment on a higher court. It is merely one aspect of respecting the Supremacy Clause of the Constitution whereby federal law is higher than State law. It is for the Congress to designate the member in the hierarchy of the federal judiciary to express the higher law. The fact that Congress has authorized district courts to be the organ of the higher law rather than a Court of Appeals, or exclusively this Court, does not mean that it allows a lower court to overrule a higher court. It merely expresses the choice of Congress how the superior authority of federal law should be asserted.

*Brown v. Allen*, 344 U.S. 443, 510, 73 S.Ct. 397, 448, 97 L.Ed. 469 (1953) (footnote omitted).

### The Status of La France Today

■ In light of the above, much of the State's discussion of *La France* is irrelevant. Regardless of how thoughtful and well-reasoned the Rhode Island Supreme Court's opinion might be, and despite the fact that its conclusions on the due process issue are shared by the courts of Montana, *see State v. Smith*, 168 Mon. 93, 541 P.2d 351 (1975), it is surely not the province of this Court to elect between their views and those of the First Circuit. Absent a clear and persuasive showing that the Court of Appeals would not adhere to *La France* today, this Court must apply it without question.

The State has not adduced, nor has the Court independently found, any reason to suppose that *La France* might no longer be good law. Certainly, there is no intervening Supreme Court case on point. The State points to *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), and argues by analogy that the strong policies against countenancing perjury justify the prosecution's use of prior inconsistent statements, even when they are obtained without full compliance with the Constitution. *Harris*, which permitted the impeachment use of statements procured in violation of *Miranda*, was decided three years before *La France*. The Court of Appeals took care to explain why that case was not controlling, and it is unnecessary to reiter-

ate its reasoning here.[4] The citation to *Alderman v. United States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), is simply inapposite. The *Alderman* rule that a defendant has no standing to challenge the denial of another's constitutional rights is obviously unexceptionable; in *La France*, however, the First Circuit emphasized that the defendant's *own* due process rights were implicated by use of a witness' involuntary statement. 499 F.2d at 34–35. The State correctly points out that the more recent decisions in *Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) and *New Jersey v. Portash*, 440 U.S. 450, 99 S.Ct. 1292, 59 L.Ed.2d 501 (1979), are factually distinguishable from the instant case. However, the State ignores the language in both cases which reaffirms the fundamental premise of *La France*: our refusal to permit the government to utilize in any way an involuntary statement stems not from concern about the reliability of the coerced utterance, but rather from abhorrence of the official lawlessness that produced it. *See New Jersey v. Portash*, 440 U.S. at 459, 99 S.Ct. at 1297; *Mincey v. Arizona*, 437 U.S. at 397–98, 98 S.Ct. at 2416. If anything, *La France* seems to rest on firmer ground after these two cases.

This Court has been unable to find any cases in which other federal courts of appeals have decided the precise question involved here.[5] Of the state courts, Illinois and California follow the *La France* view, *see People v. Tate*, 30 Ill.2d 400, 197 N.E.2d 26 (1964); *People v. Underwood*, 61 Cal.2d 113, 389 P.2d 937, 37 Cal.Rptr. 313 (1964), while Montana and Rhode Island have espoused the contrary position. Of course, this Court would not be free simply to disregard *La France* even if there were a clear majority of cases reaching the opposite conclusion. This brief survey of the

law in other jurisdictions is offered only to refute the State's implicit suggestion that *La France* is an anomaly. *See* 3 Wigmore, *Evidence* § 815 n.3 at 290 (Chadbourn rev. 1970).

### The Applicability of La France to the Instant Case

■ The decisive question, then, is whether this case falls within the *La France* rule. As outlined in *La France*, the defendant has a right to a hearing on the voluntariness of a witness' prior statement if 1) he properly raises the involuntariness claim at trial; 2) he can demonstrate that there exists a "serious factual dispute" about the circumstances under which the statement was obtained; and 3) his allegations, if proven true, would require exclusion of the statement as involuntary. 499 F.2d at 26. The Court finds that all of these prerequisites were met in this case.

When the prosecution first indicated its intention to introduce Guitard's prior statement in order to undermine the defense-favoring testimony he gave on the stand, Vargas' counsel promptly objected. When asked the basis for his objection, counsel stated: "There is a question of the voluntariness of the taking of that statement, Your Honor." Tr. at 47. The trial justice overruled the objection with the remark, "That, of course, is utterly irrelevant to this defendant." *Id.* It is true, as the State points out, that defense counsel did not then, or at the later point when the trial justice amplified his reasons for this ruling, *see* Tr. at 64–65, specifically request an evidentiary hearing on voluntariness. However, in light of the trial justice's expressed views on the legal issues, such a request would probably have been futile. In any event, this Court finds that, for

---

4. Indeed, in a recent case involving the use of involuntary statements for impeachment, the Supreme Court distinguished *Harris* in a similar fashion. *See New Jersey v. Portash*, 440 U.S. 450, 458–59, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979).

Of course, the same reasoning distinguishes *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975) (permitting impeachment

use of statements obtained by impermissible interrogation after suspect had requested a lawyer).

5. The Court of Appeals for the Fifth Circuit has arguably expressed its support for the *La France* rule. *See United States v. Fredericks*, 586 F.2d 470, 481 n.14 (1978), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1507, 59 L.Ed.2d 776 (1979).

purposes of satisfying *La France*, the defendant adequately apprised the trial court of his concerns about the voluntariness of Guitard's statement. Presumably, *La France* requires timely presentation of the issue so that convictions are not overturned in a collateral proceeding because of error that could have been avoided had the state court been warned of its presence. Here, such a warning was indeed given.

Information revealed at trial about the circumstances under which the prior statement was procured raise substantial doubts about its voluntariness. Eduardo Guitard is a Spanish-speaking individual who, although he can apparently understand some English, has difficulty communicating with English-speaking people without the services of an interpreter. *See* Tr. at 43–44. He testified before the grand jury, at the defendant's bail hearing, and at trial through an interpreter, *see* Tr. at 49–50, 33, & Tr. of Bail Hearing at 4–5, and his language problems were evident at several points during the proceedings. *E. g.*, Tr. at 47–48, 62, 313–14, 324–27. He also testified that he can't read English "too much". Tr. at 44. *See also* at 314. Yet, despite these circumstances, Guitard was interrogated by non-Spanish speaking detectives, without an interpreter present, for three to four hours, at the end of which time he signed a statement typed by the detectives in English. Tr. at 151–61. That statement was not translated for him into Spanish until several hours later, at which time he again signed it in the presence of a notary. Tr. at 47, 151, 173–74.

These facts, which the State substantially admits, might themselves be sufficient to establish that the statement was not knowingly and voluntarily given. Guitard stated at trial that he didn't really understand the statement, and that he had signed it after the detectives "told me that what was there was what we had spoken in the room." Tr. at 314–15. *See also* Tr. at 48, 107, 327. Indeed, the detective who questioned Guitard testified: "I had read the statement I had taken from Mr. Guitard to him at least twice [in English], and *I wasn't satisfied in my mind that he fully comprehended or understood the statement.*" Tr. at 157 (emphasis added). Therefore, he stated, he called an interpreter who "read the statement I had taken from Mr. Guitard, in Spanish. I wanted to make sure that he fully understood what he had said." *Id.* Surely, this is a scene worthy of Kafka or Orwell: a man is interrogated for several hours in a language he poorly apprehends; he signs a statement, written in this language, which purports to be "his"; then, he is given an interpreter who translates "his" statement into a comprehensible tongue in order that the man can understand what it was that he has said.

While it could conceivably be argued that the subsequent services of the interpreter cured the problem, so that the second signing was knowing and voluntary, this Court has doubts that any taint could be so easily dissipated. *See Wainwright v. LaSalle*, 414 F.2d 1235 (5th Cir. 1969). Guitard had already signed the statement once, he was still in custody, and the notary before whom he was taken to reaffirm his adoption of the statement was not a neutral figure, but rather a Captain of the Pawtucket Police. Moreover, Guitard testified to other circumstances which, if true, further complicate the voluntariness issue. It is undisputed that Guitard was taken into custody shortly after 1:30 A.M., and that he was interrogated until he gave a statement.[6] He signed the statement for the first time at around 5:30 A.M., and for the second time at around 9:30 A.M. Tr. at 182.

6. The Court could not find in the transcript any reference to whether Guitard was given the *Miranda* warnings. Although *La France* cautions that failure to give the warnings would not in itself mandate a finding of involuntariness in this setting, *see* 499 F.2d at 35, it is well-established that a suspect's ignorance of his rights is a factor to be considered in determining voluntariness. *See, e. g., Cole v. Florida*, 413 F.2d 1046 (5th Cir. 1969); *Fuller v. United States*, 407 F.2d 1199, 1211 (D.C.Cir. 1968), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969); *Knott v. Howard*, 378 F.Supp. 1325, 1334 (D.R.I.1974), *aff'd* 511 F.2d 1060 (1st Cir. 1975).

It is not clear whether Guitard had an opportunity to rest in that intervening period. He testified that he was extremely nervous, even frightened, *see* Tr. at 46, 94, 107, 314—a condition not surprising in someone who had been arrested at 1:30 in the morning after witnessing a man shot in the mouth with a shotgun.[7] He believed that he was himself under suspicion, Tr. at 107–108, and testified that his interrogators promised him that if he made a statement, he would not be charged. Tr. at 107. *See also* at 312. He also testified that the detectives banged on the table and swore at him, in an attempt to elicit from him a statement conforming to that given by other witnesses. Tr. at 310. Insofar as the Court can ascertain from the transcript, the prosecution did not adduce testimony to contradict many of these assertions.[8] *Cf. La France*, 499 F.2d at 35 n.4 (Government had denied all allegations at trial; hearing still required). If believed, they could, especially in conjunction with his language problem, support a finding that Guitard's statement was not the knowing and voluntary product of a free will. *See, e. g., Shotwell Mfg. Co. v. United States*, 371 U.S. 341, 347, 83 S.Ct. 448, 453, 9 L.Ed.2d 357 (1963) (promise of immunity from prosecution may constitute coercion); *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897) (defendant in custody unaccompanied by counsel; "direct or implied promises, however slight", may constitute coercion); *Makarewicz v. Scafati*, 438 F.2d 474, 478 (1st Cir.), *cert. denied*, 402 U.S. 980, 91 S.Ct. 1685, 29 L.Ed.2d 145

(1971) (issue is whether threatening or intimidating conduct by police overcame suspect's "power of resistance"); *Wainwright v. LaSalle*, 414 F.2d 1235 (5th Cir. 1969) (*inter alia*, Spanish-speaking defendant; questioning with interpreter); *Harris v. Beto*, 367 F.2d 567, 568 (5th Cir. 1966) (promise of leniency or threat of additional prosecution may constitute coercion); *United States ex rel. Vanderhorst v. La Vallee*, 285 F.Supp. 233 (D.N.Y.1968), *aff'd*, 417 F.2d 411 (2d Cir. 1969), *cert. denied*, 397 U.S. 925, 90 S.Ct. 930, 25 L.Ed.2d 105 (1970). *Cf. Johnson v. Hall*, 605 F.2d 577 (1st Cir. 1979) (ignorant, low IQ defendant not advised of rights; confession not involuntary because his prior experiences with police and obstreperous behavior in custody demonstrated he was not cowed by situation).

█ In contending that *La France* does not mandate a hearing in this case, the State asserts that Guitard, in contrast to the witness involved in *La France*, "never alleged that the statement was entirely false." Memorandum at 17. At the outset, the Court does not find the transcript so clear on this point as the State apparently does. Far from justifying the blanket assertion that Guitard "admitted that the facts contained in the statement were all true", Memorandum at 17, the transcript of Guitard's testimony is confusing and ambiguous. *Compare, e. g.*, Tr. at 315 *with* Tr. at 324–27.[9] Indeed, when the prosecutor went through the statement sentence by sentence, Guitard denied having said several crucial portions of it. *See* Tr. at 326–33.

---

7. Although nervousness *per se* will not render a statement involuntary, *see United States v. Arroyave*, 477 F.2d 157, 161 (5th Cir. 1973), it may be a substantial factor militating against a finding of voluntariness when combined with other elements that tend to wear down an individual's resistance. *See United States v. Lehman*, 468 F.2d 93, 100 (7th Cir.), *cert. denied*, 409 U.S. 967, 93 S.Ct. 273, 34 L.Ed.2d 232 (1972).

8. Even had police denied that they made promises or threats, it would remain to consider whether, because of the language barrier, Guitard misunderstood or misconstrued what was said to him as an inducement or intimidation. There is some support for the proposition that

it is the actual effect of circumstances on the accused, rather than the culpability of the interrogators, that is the key to the determination of voluntariness. *See, e. g., Townsend v. Sain*, 372 U.S. 293, 307–08, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963) (if drug in fact had effect of "truth serum", it is immaterial whether interrogators knew of its properties); *United States v. Brierly*, 267 F.Supp. 274, 282 (E.D.Pa.) *aff'd*, 384 F.2d 992 (3d Cir. 1967).

9. After reading these and other portions of the transcript, this Court wondered whether some of the apparent inconsistencies might not be traceable to the difficulties of questioning through an interpreter. *See, e. g.*, Tr. at 313–14, 324–27.

The most fundamental flaw in the State's position, however, is that it entirely misconceives the rationale of *La France*. As the Court of Appeals took pains to emphasize: "At stake is not 'improving the reliability of jury verdicts' [citation omitted], but screening out evidence which, if found to be induced by coercion, is unacceptable *regardless of its truth or untruth.*" 499 F.2d at 33 (emphasis added). *See Lego v. Twomey*, 404 U.S. 477, 486, 92 S.Ct. 619, 625, 30 L.Ed.2d 618 (1972).

### *Availability of Collateral Relief—The Applicability of the Harmless Error Doctrine*

In this Court's opinion, the most difficult question this case presents is one that neither party has addressed. Assuming that, in accordance with *La France*, a hearing on the voluntariness of Guitard's statement should have been held at trial, does the failure to hold such a hearing necessarily require collateral relief? In other words, does the concept of harmless error have any place in this type of case, and, if so, was the error indeed harmless here?

Truly involuntary confessions—as opposed to those obtained unlawfully through violations of *Miranda* or *Escobedo*—appear to constitute one of the few areas of criminal law in which courts have steadfastly refused to apply the harmless error doctrine. Even after *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967), announced that not all constitutional violations require reversal, the Court in *Lynumn v. Illinois*, 372 U.S. 528, 537, 83 S.Ct. 917, 922, 9 L.Ed.2d 922 (1968), readily concluded that the introduction of a coerced confession invariably necessitates a new trial. The lower federal courts continue to apply that rule. *See e. g., Smith v. Estelle*, 527 F.2d 430, 431–32 (5th Cir. 1976); *United States v. Bernett*, 495 F.2d 943, 959–60 (D.C.Cir.1974) (opinion of Robinson, J.).

Whether this rule extends to the case where a *witness'* involuntary statement is used for impeachment is problematic.[10] On the one hand, it could be argued that the effect on the jury of a witness' prior statement will often be considerably less than the impact of a defendant's own prior statement. While it may well be that a jury could never be unaffected by incriminating words from the accused's own mouth, *see Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 1786–87, 12 L.Ed.2d 908 (1964), might not the statements of a witness be relatively insignificant in some cases? On the other hand, the Supreme Court's refusal to find harmless error even in cases in which the other evidence of guilt was overwhelming, *e. g. Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963) (two prior admissible confessions plus substantial independent evidence), suggests that more is going on in the involuntary confession cases than simply an assessment of jurors' susceptibilities. If the constitutional infirmity in use of involuntary confessions is rooted in the conviction that prosecutorial exploitation of the fruits of official coercion irreparably pollutes the judicial process, is the governmental lawlessness any less noxious when it is directed against one who is "only" a witness?

Thus, the issue is a difficult one. The Court concludes, however, that it need not be resolved in this case. Although the question is a close one, after reviewing the record it cannot confidently be said that the introduction of Guitard's prior statement was harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. at 23–24, 87 S.Ct. at 827.

The eyewitnesses' testimony about the details of the shooting varied on several points; the only one relevant here is the timing of Vargas' retrieval and assembly of the shotgun.[11] Vargas and Guitard, at tri-

---

**10.** This question was not explicitly addressed in *La France*. The Court of Appeals characterized the witness there as a "key witness" whose testimony "easily could have affected the outcome." 499 F.2d at 35 & n.4.

**11.** Four people who had witnessed the actual shooting testified at trial: the defendant, Guitard, Debra Lewandowski, and Augustin Jaiman. Only the first three testified on this point.

al, stated that Vargas went to his trunk, removed a long box containing a shotgun, and assembled the gun *after* the victim arrived on the scene with some of his friends. Tr. at 54, 88, 390–94, 420–23. Debra Lewandowski, an eye witness, stated that the gun was removed and assembled *before* the victim appeared. Tr. at 3, 11. Her testimony conformed to what Guitard had purportedly told the Pawtucket Police in the hours after his arrest, Tr. at 330, and to what Vargas had purportedly told the detective who brought him in. Tr. at 148.

The timing of Vargas' actions in preparing the gun was relevant to the issue of premeditation.[12] Concededly, it may not have been determinative. At one point in his summation, the prosecutor suggested that premeditation was independently evidenced by Vargas' having walked towards the victim, gun in hand, arguably assuming the role of aggressor. Tr. at 456–57. The trial justice, in ruling on the new trial motion, stated his belief that premeditation could be found in Vargas' deliberate removal and assembly of the gun *even if* all that took place after the victim appeared. Tr. at 502. Nevertheless, the possibility that the jury could have ignored the issue of timing and still returned a supportable verdict of premeditated murder does not necessarily mean that they in fact did so. *See Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963).

The question of when Vargas went to his car for the gun received considerable emphasis during the testimony and in the summation. Debra Lewandowski was probed on the point by both prosecution and defense counsel. Tr. at 3–4, 11–12. When Guitard surprised the prosecution by testifying to a different sequence of events than he had purportedly included in his earlier statement to the police, the prosecution immediately sought to impeach his story by introducing the prior version. Tr. at 54–63.[13] When defense counsel elicited Guitard's testimony that Vargas had gone for the gun after the victim confronted him, Tr. at 88, the prosecution returned to the point, prompting defense counsel to object that "Counsel has asked this question [on] numerous occasions.... It's repetitive." Tr. at 93. The prosecution pressed Guitard, referring both to his prior statement to the police and to his testimony at the bail hearing.[14] Tr. at 94–100. Later, Guitard was recalled by the defense and the prosecution was permitted to read to him, sentence by sentence, the text of the prior statement and ask him, as to each, whether he had told these things to the police. Tr. at 326–33. Ultimately, the entire signed statement was introduced into evidence as an exhibit. Tr. at 178.

Thus, the timing of the gun's appearance and Guitard's apparently conflicting stories on this point were repeatedly called to the jury's attention. In closing, the prosecutor argued that Vargas did indeed assemble the

There was another issue on which several witnesses gave conflicting testimony and which appeared for a time to be quite significant—the presence of a second gun at the scene and in the possession of one of the victim's companions. Although this had the makings of a major self-defense question, the entire controversy was apparently mooted by the defendant's admission on the stand that he had not seen a second gun. Tr. at 418.

12. Guitard's testimony at the bail hearing coincided with the contents of his police statement on the timing of Vargas' removal of the gun. Tr. of Bail Hearing at 7–8. Thus, this prior testimony was also available to the State for impeachment. The prosecutor, however, chose mainly to rely on the police statement to undermine Guitard's story on the stand. Whatever its potential impact, the bail hearing testimony

actually played a fairly minor role at the trial, *see* Tr. at 96–100, and in the State's closing argument. *See* Tr. at 451.

13. The trial justice did not permit impeachment at this point, for he did not view Guitard's testimony as sufficiently hostile. Tr. at 54–63. As the testimony proceeded, however, and the deviation from the prior statement became more marked, Justice Weisberger admitted the statement in its entirety for impeachment purposes. *See* Tr. at 178.

14. Indeed, in opposing the defendant's motion for judgment of acquittal at the close of the State's case, the prosecutor relied for premeditation on the allegation that Vargas assembled and loaded the gun prior to the victim's arrival. Tr. at 185.

gun before the victim's arrival and that this was "an element of premeditation". Tr. at 452. In bolstering his argument, he emphasized the content of Guitard's prior statement. Even though that statement was supposed to be used only for the limited purpose of impeachment, Tr. at 178 & 481–82, the prosecutor repeatedly asked the jury to regard it as "true".

He argued:

We can probably believe Mr. Guitard as to what he would perceive as insignificant matters, and *probably also what he told the police that night,* he said within three hours. He didn't have time to fabricate at that point. He didn't have time to think he was helping his friend, changing his testimony any way he wants. *He said this statement is true.* He told Mr. Rogers. We had it read back this afternoon. *This statement, the statement he gave to the police that night, is true,* although he said there were things about a second gun. Sergeant King just didn't want to hear about it, told him to leave it out.

What does this statement say? Well, you will read it, but I just want to point out some things. They had an argument at Louis' Bar. There is no dispute. They were going toward 95, and Vargas suddenly turned his car around. It was Vargas' decision, this defendant's decision, to go to Crook Manor. When he got there, as you'll read, Mr. Vargas got out of the car, went to the trunk, took out a box and started to assemble the shotgun. I realize he later denied this, *but I stress to you, to Mr. Rogers' question, he said everything in here is true.* And he said, "What's that for?" And he said, "That's in case Angel Lopez comes." You know, that's the same thing Debbie Lewandowski said. The car was there. He assembled the shotgun. Why did he assemble the shotgun? In case Angel Lopez came. I suggest to you that is an element of premeditation.

Tr. at 450–52 (emphasis added).

On this record, it cannot confidently be concluded that the jury's verdict of premeditation did not rest, at least in part, on the timing of the gun's removal and assembly, and that Guitard's prior statement did not influence their findings on the subject.[15] "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut,* 375 U.S. at 86–87, 84 S.Ct. at 230, *cited in Chapman v. California,* 386 U.S. at 23, 87 S.Ct. at 827. Here, there is a reasonable possibility that the prior statement led the jury to reject the testimony of Vargas and Guitard in favor of that of Debra Lewandowski.[16] If the statement

15. While this Court does not suggest that the jury deliberately disregarded the trial justice's instructions to use the statement only for impeachment, *see* Tr. at 481–82, its potential influence on their deliberations cannot be dismissed. They took with them into the jury room a signed document, containing damaging assertions made by a long-time friend of the defendant shortly after the incident. It would have been easy to regard the statement—even subconsciously—not merely as cancelling out Guitard's trial testimony, but also—as the prosecutor had urged—as revealing the "truth".

16. Lewandowski, it seems, was not an unimpeachable witness. It was revealed that she had been the steady girlfriend of the victim's brother. Tr. at 14. She herself testified that she had been talking with her girlfriends when Vargas and Guitard first arrived and that "We wasn't paying no attention." Tr. at 3. In fact, the testimony of the fourth eyewitness, Augustin Jaiman, cast some doubt on whether Lewandowski was indeed present when the shooting occurred. Tr. at 202–05. Also, her demeanor apparently was the subject of some debate during closing arguments. *See* Tr. at 450. Finally, like the other key witnesses, her trial testimony was in some respects inconsistent with prior statements. Tr. at 29–31.

These observations are not meant to intimate any view about the relative merit of the witnesses' stories. Guitard, for his part, hardly presented a model of consistency. The Court need not find, however, that the verdict *probably* would have been different had the challenged evidence been excluded. It is enough that the inclusion of the evidence *could* have affected the outcome. *See La France,* 499 F.2d at 35 n.4. *Accord Fahy v. California,* 375 U.S.

was indeed involuntary, and thus erroneously admitted, the error cannot be dismissed as harmless.

### Disposition

In these circumstances, *La France* authorizes, and indeed approves, remand of the case to the state trial court for consideration of the voluntariness question. *See* 499 F.2d at 36. *Accord Jackson v. Denno,* 378 U.S. at 393–94, 84 S.Ct. at 1789–90. "If the statement is found not be have been coerced, the prior judgment of conviction may stand. Otherwise, the judgment should, of course, be vacated." *La France,* 499 F.2d at 36.

Therefore, it is hereby ordered that petitioner Raul Vargas be retained in custody until a hearing is held on the voluntariness of Eduardo Guitard's statement to the Pawtucket Police, provided that if such a hearing does not take place within 30 days of the date of this Order, then the writ shall issue and petitioner shall be released. If the state chooses to appeal this Order, this Court will entertain a motion to stay execution pending completion of said appeal.

So ordered.

85, 86–87, 84 S.Ct. 229, 230 (1963); *Haynes v. Washington,* 373 U.S. 503, 518–19, 83 S.Ct. 1336, 1345–46, 10 L.Ed.2d 513 (1963).